IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THEODORE LIAW,

    Plaintiff,

v.

UNITED AIRLINES, INC.,

    Defendant.

No. C 19-00396 WHA

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE**

## INTRODUCTION

In this action arising under the Montreal Convention, both parties move for summary judgment and to exclude evidence. In order to collect emotional distress damages under the Montreal Convention, plaintiff must prove bodily injury as a predicate, a showing he fails to make. To the extent stated below, therefore, defendant's motions are **GRANTED** and plaintiff's motions are **DENIED**.

## STATEMENT

Due to a crack in an outer layer of a cockpit windshield, an airliner made an unscheduled descent and landing. All were delayed but no one claimed injury save and except for plaintiff Theodore Liaw, who allegedly suffered back injury and terrifying distress as the plane descended. Now follow the details.

Liaw is the CEO of NexRep. He is a frequent flyer and a United Million Miler. In the five weeks prior to the subject flight, Liaw had been on twenty-five different flights. He got into a scooter accident about six months before the subject flight, where he went over a pothole and landed with his left hand outstretched (Dkt. Nos. 49-3 at 225:15–17, 267:15–269:7; 50-1 at 10; 54-2 at 3).

On October 27, 2018, Liaw boarded United Airlines Flight 931 heading from Chicago to London as a business class passenger. About three hours into the flight, the outer layer of the cockpit windshield cracked (but not the inner layer). The pilot announced that the plane would make an unscheduled landing, then landed in Goose Bay (Dkt. No. 24-1 ¶¶ 12–14, 16).

The plane remained on the tarmac for eight hours. Once on the rescue flight, Liaw flew from Goose Bay to London, then to Addis Ababa, then to Zanzibar to meet his then-fiancee. They then traveled to Kenya for several days for a safari trip. Once in Kenya, he took a small passenger plane to reach the safari location. Liaw and his fiancee then flew to Rome, where they visited various cathedrals, the Coliseum, Vatican City, and other tourist spots, all requiring significant walking. He has continued to fly since this vacation (Dkt. Nos. 49-3 at 48:3–13, 50:12–53:25, 55:24–56:15, 58:4–11, 70:20–72:15; 45-1 ¶ 5).

Liaw alleges that the descent during the unscheduled landing was faster than usual and that he suffered a "minor" injury within his lower back as a result of the incident. He further alleges emotional distress stemming from the incident, such as vivid nightmares and other mental injuries. Liaw first sought treatment regarding the incident at issue with Dr. Janie Hong, a therapist, to treat his alleged emotional distress stemming from the subject flight. Liaw alleges feeling a new back "soreness" and "discomfort" after the flight — an injury even he readily describes as *de minimis*. He was the first (and only) passenger to complain of any injury from the emergency landing. Liaw did not seek medical attention for his alleged back injuries until August 2019 at the advice of his lawyer — approximately ten months after the subject flight and four days before his deposition. In September 2019, Liaw received an MRI scan of his lumbar spine, which showed an annular fissure and disc bulge. He does not have current

2

plans to seek further medical attention for his back issue (Dkt. Nos. 45 at 1, 3, 9; 47-1 at 7; 49-3 at 89:3–9, 92:6–8, 199:21–201:11).

Liaw filed the instant action, alleging that he suffered back injuries and emotional distress due to the unscheduled landing. Both parties now move for summary judgment on United's liability for these alleged injuries and further move to exclude the other side's evidence (Dkt. Nos. 45, 50, 51). This order follows full briefing and oral argument.

**ANALYSIS**

The Montreal Convention governs "all international carriage of persons, baggage or cargo performed by aircraft for reward" and "provides the exclusive remedy for international passengers seeking damages against airline carriers." *Narayanan v. British Airways*, 747 F.3d 1125, 1127 (9th Cir. 2014). Article 17 of the Montreal Convention provides as follows:

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

"The Montreal Convention is the successor to the Warsaw Convention of 1929[, and] was the product of a United Nations effort to reform the Warsaw Convention so as to harmonize the hodgepodge of supplementary amendments and intercarrier agreements of which the Warsaw Convention system of liability consist[ed]." *Narayanan*, 747 F.3d at 1127 n. 2. "Although designed to replace the Warsaw Convention, the Montreal Convention incorporates many of its substantive provisions." *Ibid*. "Accordingly, in interpreting the Montreal Convention, courts have routinely relied upon Warsaw Convention precedent where the equivalent provision in the Montreal Convention is substantively the same." *Ibid*.; *see also Phifer v. Icelandair*, 652 F.3d 1222, 1224 n.1 (9th Cir. 2011) (applying precedent under Article 17 of the Warsaw Convention to a case involving Article 17 of the Montreal Convention because "any differences between the provisions are immaterial").

An "accident" for purposes of Article 17 is "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks*, 470 U.S. 392, 405 (1985). But "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident, and Article

3

17 . . . cannot apply." *Id*. at 406. Courts must focus on the "accident *which caused* the passenger's injury, and not to [the] accident which *is* the passenger's injury." *Phifer v. Icelandair*, 652 F.3d 1222, 1224 (9th Cir. 2011) (quoting *Saks*, 470 U.S. at 398). In other words, a defendant "is only liable to [a plaintiff] if her injury was caused by an accident." *Ibid*. "Any injury is the product of a chain of causes, and [the Supreme Court] require[s] only that the passenger be able to prove that some *link in the chain* was an unusual or unexpected event external to the passenger." *Saks*, 470 U.S. at 406. And, Article 17 under the Warsaw Convention did not allow recovery for "purely mental injuries." *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534 (1991).

Both sides agree that the Montreal Convention governs plaintiff's sole claim. They further agree that the cracked windshield, which occurred "on board the aircraft," constituted "an unexpected or unusual event or happening that is external to" Liaw (Dkt. No. 24 ¶ 3). The issue then is whether Liaw has sufficiently shown that the cracked windshield *caused* his back soreness. He has not.

### 1. UNITED'S MOTION TO EXCLUDE.

Liaw contends that the subject flight's purported "rapid descent" hurt his back. Ten months after the subject flight and four days before his deposition, Liaw finally saw a medical doctor — his expert witness Dr. Moshe Lewis in the instant action — for his alleged back injury (Dkt. No. 46-1 at 88:14–22). Dr. Lewis concluded that (1) a "rapid descent" — which resulting increased aerodynamic forces constituted the "unusual or unexpected event" — occurred before landing; and (2) Liaw's disc tear discovered in the MRI was caused by the forces generated during the alleged rapid descent, *i.e.*, there was a "medical probability of at least 51%" that the accident "resulted in" Liaw's back soreness (Dkt. No. 51-1 at 30). United moves to exclude this testimony, arguing that it is unreliable. This order agrees.

Under the Federal Rules of Evidence 702, an expert witness may provide opinion testimony if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Under *Daubert v. Merrell Dow Pharmaceuticals Inc*.,

4

509 U.S. 579 (1993), and its progeny, the trial court "must assess an expert's reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)) (alteration omitted). "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.' " *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert*, 509 U.S. at 597). "[T]he trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Ibid*. (citations and internal quotation marks omitted). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 565.

Dr. Lewis submits that Liaw's back soreness is the result of "the increased forces that occurred during the rapid descent of" the subject flight (Dkt. No. 47-1 at 30). That is, according to him, "posterior forces coupled with lumbar flexion created by the rapid descent" caused Liaw's alleged injury (Dkt. No. 47-1 at 30). He further observes that "[m]otion segments" exposed to a "surprise loading rate" likely fail "via some form of annular rupture," and that here, the "rapid descent represented a surprise loading rate," which "altered the forces on" Liaw's disc and caused it to tear (*ibid*.).

Dr. Lewis practices physiatry and considers himself an expert in identifying causes of lower back injury (Dkt. Nos. 47 ¶ 1; 56-3 at 27:9–17). But this alone does not qualify him to opine on the aerodynamic loads that may result in a back injury. Even assuming the descent was "rapid," the record does not show that Dr. Lewis is qualified to evaluate the very "posterior forces" and loads that he believes acted on and caused injury to Liaw's back during the incident. Although about five percent of his patients are flight attendants and pilots, Liaw's case is the first time he has ever heard of a passenger claiming to suffer a back injury due to a non-traumatic descent or landing (*id*. at 31:13–15, 33:18–25). He was not aware of any study that evaluated the

5

aerodynamic loads a passenger experiences during a commercial flight's descent — whether or not that descent was rapid — that would be significant enough to cause an annular fissure (Dkt. No. 51-1, Exh. B at 148:11–16). The research articles Dr. Lewis reviewed for this case included studies regarding flight crew members, astronauts, and helicopter pilots (Dkt. Nos. 47-1 at 31–36; 56-4 at 119:4–7). Those studies, which distinguished those subjects from passengers, focused on their long-term exposure to certain conditions (Dkt. No. 56-4 at 119:22–120:10). He was not aware of any literature addressing a *passenger's* back injuries due to a single commercial flight (Dkt. No. 56-4 at 118:12–119:3).

Moreover, Dr. Lewis's testimony during his deposition reveals that his observations are speculative. The nub of Dr. Lewis's conclusion as to causation, boiled down during his deposition and reiterated during oral argument, is as follows: "two abnormal things occurred" — the unscheduled landing and his alleged back soreness soon thereafter — and "there's a concern about there being a causative link because both were abnormal" (Dkt. No. 51-1, Exh. B at 182:14–183:3, 183:19–21, 184:10–12). But this, by itself, shows correlation, not causation. He goes further when pressed about the subject flight's descent rate, stating that he "could still state that with 51 percent certainty" that the subject flight's descent, "*even if it were normal*," caused Liaw's back injury, as there are "much more even benign situations [that] can cause" a the back injury (*id*., Exh. B at 134:6–13, 136:18–22 (emphasis added)). That is, according to Dr. Lewis, it was "[n]ot completely" necessary for an evaluating doctor to consider "the amount of forces that one sustained in a traumatic event to determine causation" of a disc bulge, as a disc bulge "can be caused by something as minimal as coughing or sneezing" (Dkt. No. 56-3 at 38:11–19). In light of the foregoing, Dr. Lewis's bare-boned conclusion of causation essentially parrots attorney argument.

\*  \*  \*

These issues do not merely go to the weight of Dr. Lewis's testimony (particularly where both Liaw and Dr. Lewis failed to offer *any* relevant testimony as to descent and loading rates), as Liaw contends. Rather, this order agrees with United that there "is simply too great an

6

analytical gap" between the established facts in this case and Dr. Lewis's opinion as to causation. Accordingly, United's motion to exclude is **GRANTED**.

### 2. LIAW'S MOTION TO EXCLUDE.

Liaw seeks to exclude all evidence United allegedly failed to disclose in its interrogatory responses, responses to requests for document production, or initial disclosures. He also seeks to exclude United's expert witnesses under Rule 37 for allegedly failing to timely disclose them and their reports (Dkt. No. 45).

#### A. Liaw's Discovery Disputes.

Liaw only now raises the instant litany of discovery complaints in conjunction with the instant motions for summary judgment, which the parties filed on the last day possible. He never sought court intervention for his supposed discovery woes before this late stage. Nor does he explain why he was unable to move to compel production at any time prior to the instant motion or do anything to mitigate the alleged gamesmanship by United. Even assuming preclusion may be warranted "regardless of whether any discovery motion was made," as Liaw contends, his current laundry list of alleged discovery fouls made by United, which he apparently allowed to pile up, suggests that he failed to diligently pursue discovery. He may not be heard to complain now of United's alleged stonewalling for the first time at this late stage. And, the fact that Liaw did not seek prior court intervention throughout the course of this litigation indicates that any prejudice he might have incurred by United's alleged stonewalling is minimal. This order therefore declines to impose the draconian discovery sanctions Liaw now seeks, as further discussed below.

*First*, Liaw argues that United failed to identify relevant facts and/or documents in its discovery responses (Dkt. No. 45 at 14–15). He takes particular issue with United's alleged failure to produce its internal flight data — the flight data recorder ("FDR") data — for Flight 931. As United explains, however, it did not retain that data, as it is recorded over every flight due to limited storage capacity unless the FDR "is removed and preserved for an NTSB investigation as required by federal law" (Dkt. Nos. 57 at 8; 57-1 ¶ 17; 57-1, Exh. I at 29:15–24). *Since the incident at issue was not reportable to the NTSB and no one complained of any injury*

*regarding that flight until Liaw's lawsuit ten months after the fact, United was not obliged to preserve the FDR* (Dkt. No. 57 at 8). Liaw's braying about a cover up is preposterous. Liaw fails to show anything to the contrary or offer any evidence that United purposefully stonewalled the production of the FDR data.[1]

*Second*, he next asserts that, in its initial disclosures, United failed to identify flight data records as one of the categories it intended to rely upon (Dkt. No. 45 at 15). Specifically, United's expert relied upon data from FlightRadar24.com, a publicly available third-party website "that logs and distributes aircraft information to customers," to calculate the subject flight's descent rate as well as the descent rates of other recent flights Liaw had been on prior (Dkt. No. 50-1, Exh. C at 88, 101–02). But Liaw was clearly on notice of the FlightRadar24 data and United's potential use of said data. *In fact, he used the same data for the subject flight throughout the course of this litigation* (*see, e.g.*, Dkt. Nos. 24-1 ¶¶ 18–20; 54-2 at 3). United pointed this out to Liaw in its interrogatory response — it specifically flagged FlightRadar24.com and reminded Liaw that the necessary data was equally accessible to him (Dkt. No. 46-4 at 7–8).[2] It *produced* the FlightRadar24 data for the subject flight (Dkt. No. 46-9). Furthermore, United disclosed its reliance on this data in its amended responses to Liaw's second set of interrogatories (Dkt. No. 46-12).

United further explains that it did not disclose the FlightRadar24 data as to the other comparable flights Liaw took, which its experts relied upon, because it never had possession of said data (Dkt. No. 54 at 22–23). Rather, its expert independently obtained that information in analyzing the descent rates of other flights taken by Liaw (Dkt. No. 57-1, Exh. I at 21:25–22:5). That is, he created his own account with FlightRadar24 and searched for specific flights (*id*. at 22:6–15). And, Liaw fails to specify *how* United's alleged failure to produce those flights' FlightRadar24 data — which, to repeat, has been equally available to Liaw throughout the

---

[1] Liaw's argument under the best evidence rule also fails for this reason.

[2] Liaw repeatedly contends that United "took the position that flight data records for comparable flights were not a relevant topic for this lawsuit" (Dkt. No. 55 at 4). Not so. United objected to the relevancy of the descent rate of the subject flight as compared to the descent rates of *other Flight 931s* that Liaw was not a passenger of (*see* Dkt. Nos. 46-4 at 7; 46-10 at 1).

8

duration of this case — prejudiced him from building his case. He claims that "*every* material fact relied upon by United's experts," such as "the purported descent rate" and "comparable flights taken by" Liaw, should have been disclosed by in United's discovery responses, which would have supposedly helped him decide whether further discovery was needed (Dkt. No. 58 at 13). To repeat, United's experts drew these facts based on the publicly available FlightRadar24 data. Nor does Liaw specify how he has been prejudiced. He does not, for example, explain whether he would have sought other depositions or sought further discovery. And though Liaw accuses United of delaying providing dates for its expert depositions, the interaction between the parties' counsel demonstrate both United's foot-dragging *and* Liaw's lack of diligence in seeking the deposition, as he waited at least nine days before following up with United for its experts' available dates for depositions (*see* Dkt. No. 55-7).

*Third*, all other complaints by Liaw of alleged non-disclosure are similarly trivial. He argues, for example, that the declarations by the captain and first officer of the subject flight, Captain Frank Tritico and First Officer Norbert Rock — whom United identified in their Rule 26 disclosures — should be excluded because (1) the declarations have not been produced to Liaw before United filed them with the instant motion, and (2) their factual contents should have been disclosed in United's interrogatory responses (Dkt. No. 45 at 15–16). Of course, United was not obligated to disclose its declarations to Liaw before using them to support its motion — neither was Liaw for his own supporting declaration. And, Liaw again fails to point to any *specific* fact in those declarations that he contends "should have been disclosed" by United. A glance at Captain Tritico and First Officer Rock's three-page declarations readily shows that the main factual content in those declarations — namely, (1) the unscheduled landing in Goose Bay due to the windshield crack, which occurred at cruise altitude; (2) the flight's descent and landing were normal; (3) there was no other damage to the aircraft — had already been disclosed in United's interrogatory responses, with all other minor details going toward those main points (*see* Dkt. Nos. 46-2, 46-3, 46-4, 46-5, 46-8, 50-3, 50-4).

\*      \*      \*

Indeed, Liaw's failure to show prejudice by the alleged new disclosures permeates throughout his request to exclude United's evidence. He does not point out *any specific fact or document* in all of the briefing addressed in this order that, had United disclosed earlier, would have affected his ability to support his claim (*see* Dkt. No. 45 at 14).

Nor is Liaw's reliance on *Cambridge Electronics Corp. v. MGA Elecs., Inc.*, 227 F.R.D. 313, 322–23 (C.D. Cal. 2004), for the proposition that "such non-disclosures are inherently harmful because [they] prevent[] the receiving party from taking discovery as to those specific facts and hinders their ability to rebut or explain such evidence," persuasive (Dkt. No. 58 at 13–14). There, in response to the defendants' interrogatories relating to the plaintiff's alter ego claim, propounded almost a year after the plaintiff amended its complaint, the plaintiff simply objected "on the grounds that [they sought] premature disclosure of information" and merely generally pointed the defendant to its business records. *Cambridge Elecs.*, 227 F.R.D. at 321–22. In opposing the defendants' motion for summary judgment, the plaintiff proffered a declaration that included disclosed new facts that finally put the defendant notice of its liability theories. *Id*. at 323–24. Because the new facts only raised new questions that the defendants had no opportunity to investigate, and thus the defendants had "no way to rebut or explain the evidence at [that] point," the district court found the plaintiff's non-disclosure prejudicial and thus excluded the evidence. *Id*. at 324–25.

Here, in contrast, the material fact underlying United's defense has always been clear: Liaw's alleged injury "was not proximately caused by the broken windshield, the rate of descent or landing" and "the rate of descent and landing were within normal parameters (*see, e.g.*, Dkt. No. 46-4 at 2–4). United's expert reports go toward supporting this already disclosed theory. Further, those experts relied upon FlightRadar24 data equally accessible (and known) to Liaw. And, unlike in *Cambridge Electronics*, Liaw had the opportunity to depose United's experts "to rebut or explain the evidence," which he did (Dkt. No. 57-1, Exhs. I, J). Under these circumstances, United has sufficiently shown that its proffered evidence in the instant motions does not unfairly surprise Liaw and that any non-disclosure was harmless.

### B. United's Expert Reports.

United offers expert testimony by Dr. Adam Dershowitz, who testified as to the descent rates of various flights (including the subject flight), the subject flight's aircraft maneuvering, and load rates. He found that all parameters for the subject flight were normal. He was "asked to analyze the flight path of the aircraft during the incident," particularly, the flight descent (Dkt. No. 57-1, Exh. I at 12:3–7, 13:1–3).

Building on Dr. Dershowitz's aerodynamic findings, Dr. Bruce Miller testified as to the biomechanics of the impact Liaw's back endured during the subject flight. He opined that "in terms of studies that have been conducted on [] a large number of asymptomatic individuals, age is the predominant factor that is associated with degenerative conditions" (Dkt. No. 57-1, Exh. J at 23:2–6). He further counters Dr. Lewis's (Liaw's expert) reliance on studies related to helicopter flight crew, air force pilots, and astronauts for lacking relevant context, as those individuals "are probably being subjected to [a] very different loading than you would expect on a passenger in a commercial airline flight" (*id*. at 28:12–19).

Liaw argues that United failed to serve any reports by the deadline for expert report disclosure (Dkt. No. 45 at 12). He contends that though his expert witness is a medical doctor, none of United's experts have any medical training and thus United's expert reports are not true "rebuttal" reports. Liaw further attempts to exclude United's expert reports on a host of other technicalities. This order disagrees.[3]

*First*, as to the Dershowitz and Miller reports, this order agrees with United that its expert reports were properly served as opposition reports, as they "addressed the exact 'same issues' on which Dr. Lewis opined, namely, whether the descent was rapid, and whether the forces were sufficient to rupture plaintiff's lower back disc (Dkt. Nos. 26 ¶ 4; 54 at 18–19). Liaw — not United — bears the burden of proving liability. As the case management order laid out, "each party shall serve a list of issues on which it will offer any expert testimony in its case-in-chief" in order to allow all parties to "timely . . . obtain counter-experts on the listed issues" (Dkt. No. 26

---

[3] Liaw also moves to exclude expert Captain Barry Schiff, whom United retained to analyze the subject flight's descent and landing. Because this order does not rely on Captain Schiff's report, Liaw's request is **DENIED AS MOOT**.

11

¶ 4). Liaw's own liability theory — and Dr. Lewis's expert report — hinges on the subject flight's supposed "rapid descent." That United denies, as an affirmative defense, the "rapid descent" and attendant loading rates Dr. Lewis assumes in opining on causation does not shift Liaw's burden of proof for present purposes.

Further, Dr. Dershowitz and Dr. Miller's reports are clearly aimed to attack Dr. Lewis's assumptions of descent rate. Building on Dr. Dershowitz's evaluation (which found normal descent rate), for example, Dr. Miller analyzed the biomechanics at play during the incident at issue. Specifically, he opined "to a reasonable degree of scientific and biomechanical certainty" in relevant part that the "loads acting on Mr. Liaw's lumbar spine during the subject incident were substantially lower than those reported in the biomechanical literature resulting in acute or traumatic damage to the bones, ligaments, and discs of the spine" and that Liaw "did not experience injurious loading to his lumbar spine during the subject incident (Dkt. No. 50-1 at 83–84).

Liaw argues that he cannot be expected to find his own aeronautical engineer, biomechanical enginner, and pilot counter-experts to submit rebuttal reports (Dkt. No. 45 at 13). Yet Liaw himself conceded that he retained (and continues to retain) an "aviation expert" for this case. He could have requested and analyzed the same FlightRadar24 data United's experts relied upon. And, ultimately, the schedule under the case management order is meant to protect against sandbagging. Liaw always had notice that the rate of the subject flight's descent and landing was at issue. He thus cannot credibly claim to being sandbagged by United's expert reports.

*Second*, Liaw now suddenly takes issue with United's use of the FlightRadar24 data, asserting that the data is unauthenticated and contains hearsay (Dkt. No. 55 at 8–10). These complaints, however, come too late. In a prior email exchange during discovery, both parties' counsel discussed the use of FlightRadar24 data (Dkt. No. 54-3). At no point did Liaw suggest the evidentiary inadequacy of the data. In fact, Liaw himself requested that United "not challenge any information presented by [him] purporting to come from FlightRadar24, such as what was alleged in the complaint," "if United [was] going to point to FlightRadar24 data" in determining other flight descent times (*id*. at 4). Liaw's challenge to the use of FlightRadar24

data is thus unpersuasive given his abrupt about-face, as he relied upon this very source of data in bringing the instant suit and proposed its stipulated use for both sides.

And, regardless of Liaw's flip flop, Dr. Dershowitz, one of United's experts, testified under oath that he personally downloaded the FlightRadar24 data from the website after creating his own account and explained how he verified the data for specific flights (Dkt. No. 57-1, Exh. I at 21:25–22:5, 23:3–17). He further testified that he had used FlightRadar24 data before and that said data "is an acceptable source to download data" (*id*., Exh. I at 22:19–20, 24:12–13).

*Third*, Liaw complains that United's experts failed to place their testimony in a declaration and instead merely attached their unsworn reports and declarations (Dkt. No. 45 at 12–13). Since Liaw's counsel did exactly the same thing, this point is forgiven.

### 3. CROSS-MOTIONS FOR SUMMARY JUDGMENT.

Both parties move for summary judgment on United's liability (or lack thereof) under the Montreal Convention for Liaw's alleged back soreness. According to Liaw, he established the requisite "link in the chain" of causation where "the shattered windshield . . . is what directly led to the rapid descent" (Dkt. No. 45 at 10). He describes himself as an "eggshell plaintiff," presumably to account for the fact that out of the over 200 other passengers on the subject flight, he is the only one who has complained of any injury.

Liaw does not have *any* evidence as to causation without Dr. Lewis's (now stricken) testimony. And, as discussed above, Liaw failed to set forth any evidence as to the rapidity of the subject flight's descent — the linchpin of his causation theory — aside from his own testimony. But his subjective recollection, by itself, is insufficient to create a genuine issue of fact in light of United's admissible evidence.

United's evidence demonstrates that there is no indication that the subject flight's descent rate and landing was anything but normal. For example, while the subject flight had a peak descent rate of 2446 ft/min, his prior flight on October 21, 2018, had a peak descent rate of 3500 ft/min — constituting a 43 percent increase (Dkt. No. 57-1 at 111–12). Nor did United's expert find any unusual aircraft manuevering and heightened load rates regarding the subject flight, other than the unusual landing in Goose Bay rather than Heathrow (*id*. at 112). First Officer

1 Rock, who was at the controls in the cockpit at the time of the windshield crack, "reduced speed
2 and began gradually descending without adding pressure," as advised by the flight manual (Dkt.
3 No. 50-2 ¶¶ 7, 11). Captain Tritico further states that the "descent and landing were controlled,
4 and never involved any maneuvers, rate of descent, or speed that is atypical for descents and
5 landings" and that "much of the descent occurred while the aircraft was on autopilot" (Dkt. No.
6 50-3 ¶ 10). Though the cracked windshield was "unexpected," there is no evidence in the
7 current record that the descent and landing themselves — the alleged cause of Liaw's current
8 back discomfort — were anything but routine.

At oral argument, Liaw attempted to create a triable issue of fact by pointing to a United employee's description of the incident, which stated someone notified said United employee that a cockpit windshield cracked but was still intact, and that the plane was "landing in 20 min[utes] in Goose Bay" (*see* Dkt. No. 44-3 at 38). This contradicts United's expert testimony that the subject flight took about forty minutes to land, he says, and so this case must go to trial. Not so. The United employee's statement, read in context, is not inconsistent with United's expert testimony. Rather, on this record, that statement merely suggests that, *at the time that United employee was informed of the subject flight's diversion*, there was twenty minutes left until landing.

Even worse, Liaw's liability theory is a moving target. In line with his complaint and expert report, Liaw asserted in his opening brief that his back soreness "was more than likely caused by the rapid descent that resulted after" the subject flight "began its emergency landing" (Dkt. Nos. 24-1 ¶ 16; 45 at 3). His reply seems to glide away from this, arguing ultimately in his reply brief that the fact that there was some unexpected event, *i.e.* cracked windshield, and that he gained some back soreness sometime thereafter, is sufficient to show proximate causation (Dkt. No. 58 at 3). But Liaw cannot abandon his original theory so casually without facing new problems. Of course, he does not argue that the cracked windshield *itself*, without more, proximately caused his back to feel sore. And, despite his equivocation, nor can he reasonably argue that a normal landing — whether in the scheduled destination, London, or Goose Bay — could have caused (or contributed to) his back soreness for purposes of the Montreal

14

Convention. Ultimately, the amount of speculation necessary to conclude that the cracked windshield somehow caused Liaw's alleged injury is vast. Liaw thus falls short.

Knowing that he suffered *de minimis* bodily injury, Liaw asserts that "more importantly," he "also suffered severe emotional distress as a result of" the accident (Dkt. No. 45 at 1). It is thus clear that the crux of Liaw's complaint lies in his alleged mental injuries. He acknowledges that these injuries are unrelated to his minor bodily injury. He urges the Court to be the first to adopt *Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406 (6th Cir. 2017), as a matter of first impression in this circuit, where the United States Court of Appeals for the Sixth Circuit held that passengers may recover for mental injuries unrelated to the bodily injury caused by an "accident" under the Montreal Convention. This order, however, need not and does not reach this issue, as Liaw failed to establish even the requisite bodily injury under the Montreal Convention, as discussed above. *See Doe*, 870 F.3d at 417–18 ("What the plain text of Article 17(1) also makes clear is that a passenger cannot recover damages for mental anguish if there is no requisite accident or if the accident does not cause a bodily injury"). Without diminishing Liaw's alleged emotional distress stemming from the emergency landing, this order therefore finds that the Montreal Convention does not cover his alleged mental injuries.[4]

At bottom, there is simply no evidence that Liaw's back soreness was caused by any abnormal occurrence on the flight in question. Any claim of causation on this record is speculative and the Court will not bring in and trouble jury members from all over this district to hear this claim. Accordingly, United's motion for summary judgment is **GRANTED** and Liaw's motion for summary judgment is **DENIED**.

### 4. MOTIONS TO SEAL.

Both sides filed administrative motions to file under seal certain portions of exhibits and deposition transcripts in connection with the underlying motions (Dkt. Nos. 44, 49, 52).

In this circuit, courts start with a "strong presumption in favor of access" when deciding whether to seal records. *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir.

---

[4] Neither party disputes that Liaw may not recover for any mental injuries under the Montreal Convention unless there was also a bodily injury caused by the accident (Dkt. No. 49 at 9 n.2).

15

2006) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)). Parties seeking to seal judicial records relating to motions that are "more than tangentially related" to the merits bear the burden of overcoming the presumption with "compelling reasons" that outweigh the general history of access and the public policies favoring disclosure. *Ctr. for Auto Safety v. Chrysler Grp. LLC*, 809 F.3d 1092, 1099 (9th Cir. 2016). Furthermore, Civil Local Rule 79-5(b) requires administrative motions to file under seal to "be narrowly tailored to seek sealing only of sealable material."

### A. Liaw's Motion to Seal.

In connection with his motion for summary judgment and to exclude, Liaw seeks to seal (1) Exhibit F to the Gaw declaration; (2) Exhibit A to the Gaw declaration; and (3) Exhibit 1 to the Dr. Lewis declaration (Dkt. No. 44). He seeks to seal the same information in connection with United's *Daubert* motion (Dkt. No. 52).

As to Exhibit F, Liaw seeks to seal pursuant to United's confidentiality designation (Dkt. No. 44-1 ¶ 3). United, however, failed to file a supporting declaration as required by Civil Local Rule 79-5(e). Accordingly, Liaw's motion to seal Exhibit F is **DENIED**.

As to Exhibit A, Liaw seeks to seal pages 68–69, 74–75 of the Liaw deposition transcript, stating that those portions "contain confidential, sensitive, and intensely private information" concerning his "emotional state" (Dkt. No. 44-1 ¶ 4). He argues that compelling reasons exist to seal those portions because the public has no interest "in learning about the private and highly personal emotional distress that" he experienced as a result of the subject flight (Dkt. No. 44 at 1). He "understands that information will become public at trial," yet somehow believes that "there is no serious argument that the public needs to know such information in connection with a summary judgment motion" (*ibid*.). But summary judgment motions are clearly "more than tangentially related" to the merits. The compelling standard thus applies and Liaw has already conceded that said information should be made public under this standard. Accordingly, Liaw's motion to seal the aforementioned portions of Exhibit A is **DENIED**.

As to Exhibit 1 of the Dr. Lewis declaration, Liaw seeks to seal pages 5–6, 8–11, 15, and 24–25 of Dr. Lewis's expert report, stating that (1) pages 5–6 "reflect private medical

1  information" from his medical checkups with his primary care physician, and (2) pages 8–11, 15,
2  and 24–25 contain excerpts to his deposition transcript that include "confidential, sensitive, and
3  intensely private information" about his "emotional state, his relationship counseling, as well as
4  [his] finances and business dealings that are not relevant issues in this lawsuit" (Dkt. No. 44-1 ¶
5  5). This order finds compelling reasons to seal Liaw's private medical records found at pages
6  5–6 and information irrelevant to the merits of Liaw's claim found at pages 15 and 24–24. The
7  other pages Liaw seeks to seal (pages 8–11), however, reflect the same information on his
8  alleged emotional state as in his deposition transcript (which must be disclosed, as discussed
9  above). Accordingly, Liaw's request to seal pages 5–6, 15 and 24–25 is **GRANTED**. The motion
10 is otherwise **DENIED**.

Liaw's request to seal Dr. Lewis's expert report in connection with United's *Daubert* motion (Dkt. No. 52) is **GRANTED IN PART AND DENIED IN PART** to the same extent as discussed above, as those portions mirror Exhibit 1 of the Dr. Lewis declaration. The docket entry (Dkt. No. 51-1) will be removed in its entirety and will allow United to file an appropriate redacted version in comport with this order.

### B. United's Motion to Seal.

In connection with its motion for summary judgment, United seeks to seal (1) certain portions of Liaw's deposition transcript (Exhibit B to the Cutler declaration), and (2) his Olympic Club records pursuant to Liaw's confidentiality designation (Exhibit D to the Cutler declaration) (Dkt. No. 49). Liaw's supporting declaration states that as to Exhibit B, he only seeks to seal (a) the photos of third parties found in LIAW0012, and (b) his home address, account number, and charge amounts, as none of the aforementioned information is relevant to the merits of his claim. The information further reflect his and/or third-parties' private information (Dkt. No. 53 ¶¶ 3–4). Compelling reasons having been shown, United's motion to seal is **GRANTED** to the extent supported by Liaw's declaration. The motion is otherwise **DENIED**.

*     *     *

The parties shall file unredacted versions of the documents at issue in comport with this order by **NOVEMBER 27 AT NOON**.

## CONCLUSION

To the extent stated above, United's motions for summary judgment and to exclude Liaw's expert testimony are **GRANTED**. Liaw's motions for summary judgment and to exclude United's evidence are **DENIED**. Judgment will follow.

**IT IS SO ORDERED.**

Dated: November 22, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE